# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF GEORGIA
# BRUNSWICK DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | CRIMINAL CASE NO.: 2:15-cr-14 |
| v. | |
| ROBERT MILLER, | |
| Defendant. | |

## ORDER and MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Defendant Robert Miller ("Miller") has been charged with distribution of child pornography, in violation of 18 U.S.C. § 2252A(a)(2); possession of child pornography, in violation of 18 U.S.C. § 2252A(a)(5)(B); and receipt of child pornography, in violation of 18 U.S.C. § 2252A(a)(2). (Doc. 1.) Miller filed a Motion to Suppress Statements. (Doc. 20.) The Government filed a Response. (Doc. 26.) The undersigned conducted an evidentiary hearing on Miller's Motion on September 1, 2015, at which William Kirkconnell, Special Agent with the Federal Bureau of Investigation, testified. Defendant filed a post-hearing Brief, as did the Government. (Docs. 36, 37.) For the reasons which follow, Miller's Motion should be **DENIED**.

## BACKGROUND

The credible testimony given at the hearing reveals the following. On the morning of June 23, 2015, Kirkconnell, along with Liberty County Sheriff's Department Detective Charles Woodall, Georgia Bureau of Investigation Special Agent John Barry, and Wayne County

Sheriff's Department Deputy Brandon Rozier,[1] executed a search warrant on Miller's residence. Kirkconnell rang the doorbell of Miller's house at approximately 8:15 that morning. Miller came to the door, and Kirkconnell showed Miller his credentials. Kirkconnell asked if the police officers could speak with Miller, and the officers entered the house. (Doc. 35, p. 7.) Kirkconnell asked Miller if he had any idea why he and the other officers were at his house, and Miller did not respond. Kirkconnell then informed Miller he and the other officers present were with the Southeast Georgia Child Exploitation Task Force. Kirkconnell asked Miller again if he had any idea why the officers were at his house, and Miller said he did. (Id.) Kirkconnell told Miller that there was probable cause to believe somebody in the house was in possession of child pornography, and Miller admitted it was him. (Id. at pp. 7–8.) Kirkconnell asked Miller where the computer was, and Miller said it was in the bedroom.

At this point, Detective Rozier and Agent Barry went into the bedroom to examine the computer, while Kirkconnell and Woodall spoke with Miller in the living room/kitchen area of the house. (Id. at p. 8.) Prior to having a conversation with Kirkconnell and Woodall, Miller secured his dog in another room of his house. Kirkconnell informed Miller he was not under arrest, but Kirkconnell again told Miller officers had probable cause to believe someone in the house was in possession of child pornography. Miller "readily admitted" it was he who was in possession of child pornography. (Id. & at p. 21.) Kirkconnell stated Miller informed him and Woodall that he had been looking at child pornography for more than five years' time, and he admitted to having downloaded three or four videos "of little girls" during the previous evening. (Id. at pp. 8–9.) Miller also admitted to having recently deleted at least 200 videos from his

---

[1] Kirkconnell testified during cross-examination it was possible Effingham County Detective Joseph Heath assisted with the execution of the search warrant, but if he had been present at Miller's house, he was assisting with the search of Miller's computer. (Doc. 35, p. 16.) Indeed, Agent Barry's report indicates Joseph Heath was present during the execution of the search warrant. (Doc. 36-1, p. 1.)

computer depicting child pornography because these videos were causing his computer to run slowly. (Id. at p. 30.) Kirkconnell described Miller as being "extremely cooperative[ ]" with the officers during their "cordial conversation[.]" (Id. at p. 9.) In fact, Miller provided the password to his computer, which was "buds46", and he also stated he lived alone. (Id. at pp. 12, 28.)

After asking Miller questions, Kirkconnell went to the bedroom where Barry and Rozier were. Kirkconnell asked Barry whether he was having any success locating any child pornography on Miller's computer, and Barry said he was not. However, Agent Barry eventually came out of the bedroom and indicated that he found child pornography on the computer. Agent Barry also informed Kirkconnell that Rozier intended to arrest Miller at that time. Kirkconnell informed Miller he was going to be arrested and read the advice of rights form with Miller. Miller invoked his right to silence at the end of this reading, and that was the end of the interview. (Id. at pp. 10, 32.) Miller made a phone call to secure care for his dog in the event he did not get released from jail on bond. (Id. at p. 33.)

Kirkconnell testified that the entire interview of Miller lasted between five to eight minutes' time, and Miller was extremely cooperative the entire time officers were at his house. (Id. at p. 28.) Although officers were present at Miller's house for approximately 90 minutes, the majority of that time was spent searching Miller's computer, awaiting the arrival of another officer who had handcuffs, and permitting Miller to secure care for his dog. (Id. at pp. 12, 32–33.) In addition, Kirkconnell stated he had his weapon on his hip next to his badge, Agent Barry's gun was on his ankle but was not visible, and Detective Woodall was not carrying a gun. (Id. at p. 13.) However, no one drew a gun at any time. (Id.) Further, there were no "demanding tone[s]", "aggressive questions", or "coercive demeanor or gestures" used by the officers at any time. (Id. at p. 14.)

**DISCUSSION**

Through his Motion, Miller seeks to have the statements he made to Agent Kirkconnell on June 23, 2015, suppressed because Miller was not advised of his Miranda[2] rights prior to any questioning. To determine whether Miller's statements should be suppressed, this Court must determine whether Miller was "in custody" for purposes of Miranda. Miller has the burden of establishing that he was in custody at the time of the agent's questioning. United States v. de la Fuente, 548 F.2d 528 (5th Cir. 1977).[3]

## I.   The Parties' Assertions

Miller asserts a reasonable person in his position would have felt his freedom of movement was restricted such that he could be considered under formal arrest at the time Kirkconnell and Woodall spoke with him while at his house on June 23, 2015. Miller contends that, because he was not given his Miranda warnings until after he answered Kirkconnell's and Woodall's questions, his statements made in response to those questions should be suppressed. (Doc. 20, p. 4.)

In support of his contention that he was in custody at the time of Kirkconnell's interview and entitled to Miranda protections, Miller asserts he was never told he was free to leave, that he could stop answering questions at any time, or that he could answer only the questions he wished to answer. Miller also asserts he was not told he was not under arrest. (Doc. 36, p. 3.) Miller contends a major factor suggesting the interview was custodial is that Kirkconnell relayed his suspicion that Miller was the perpetrator of the crime being investigated. (Id.) Miller also states the interview lasted for an hour and a half, and he was not released at the end of the interview.

---

[2] Miranda v. Arizona, 384 U.S. 436 (1966).

[3] The Eleventh Circuit Court of Appeals has adopted the decisions of the former Fifth Circuit Court of Appeals as binding precedent. Bonner v. City of Prichard, 661 F.2d 1206, 1207 (11th Cir. 1981).

4

According to Miller, these factors help suggest the interview was custodial in nature. In support of his assertions, Miller cites Stansbury v. California, 511 U.S. 318 (1994), and Howes v. Fields, ___ U.S. ___, 132 S. Ct. 1181 (Feb. 21, 2012),.

The Government responds that the relevant inquiry is whether a reasonable, innocent man in Miller's position would feel free to decline the officers' requests for information under the totality of the circumstances. The Government notes that only two officers sat with Miller at the dining table, and he cannot maintain that a coercive environment existed. While the Government asserts Miller was not allowed to do whatever he wished in his home while the search was being conducted, such restrictions on his movement were reasonable for safety reasons and to protect the integrity of the search. (Doc. 26, p. 12.)

The Government alleges Kirkconnell was required to tell Miller why he and the other officers were at his house executing a search warrant. The Government also alleges that, while agents were in Miller's house for approximately 90 minutes, the interview lasted only five to eight minutes; the rest of the time was dedicated to the search of the house, waiting on a local officer with handcuffs to arrive at Miller's house, and waiting on the person who was going to take care of Miller's dog to get to his house. (Doc. 37, pp. 3–4.) The Government concedes that Kirkconnell omitted from his report that he told Miller he was not under arrest. However, the Government states that this omission does not lend support to Miller's assertion that he was never told he was not under arrest. The Government argues that the fact that Miller was not given his Miranda warnings prior to the interview does not prove he should have been given those warnings. The Government contends that Miller was not "released" after this interview because there was no detention from which to be released. (Id. at p. 8.)

## II. Whether Miller was "in Custody" When Kirkconnell Interviewed Him

"No person . . . shall be compelled in any criminal case to be a witness against himself[.]" U.S. CONST. amend. V. "[T]he prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination."[4] Miranda, 384 U.S. at 444 (1966). Custodial interrogation means "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." Id. The circumstances of each case dictate "whether there is a restraint on the suspect's freedom of movement 'of the degree associated with a formal arrest.'" United States v. Phillips, 812 F.2d 1355, 1360 (11th Cir. 1987) (quoting Minnesota v. Murphy, 465 U.S. 420, 430 (1984)).

An objective, reasonable person test has been adopted "in cases involving custody issues." Id. at 1359. In applying this test, "the only relevant inquiry is how a reasonable [person] in the suspect's position would have understood [the] situation." Id. at 1360. In other words, the inquiry is whether "a reasonable [person] in the suspect's position would feel a restraint on his freedom of movement fairly characterized as that 'degree associated with a formal arrest' to such extent that he would not feel free to leave" the scene. Id. (quoting Murphy, 465 U.S. at 430). The determination of custody for Miranda purposes "depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." Stansbury, 511 U.S. at 323.

The right to Miranda warnings attaches when custodial interrogation begins. United States v. Acosta, 363 F.3d 1141, 1148 (11th Cir. 2004). Miranda itself held that pre-

---

[1] "Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." Miranda, 384 U.S. at 444.

6

interrogation warnings are required in the context of custodial interrogations given "the compulsion inherent in custodial surroundings." Miranda, 384 U.S. at 458. The Supreme Court explained that "custodial interrogation" means "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." Id. at 444. However, as the Court noted in Yarborough v. Alvarado, 541 U.S. 652, 661 (2004), the Miranda decision did not provide the Court with an opportunity to apply that test to a set of facts. As those opportunities arose, the Supreme Court defined custody for the purposes of Miranda as a "formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." California v. Beheler, 463 U.S. 1121, 1125 (1983) (internal citation and punctuation omitted).

"[W]hether a suspect is 'in custody' is an objective inquiry." J.D.B. v. North Carolina, ___ U.S. ___, 131 S. Ct. 2394, 2402 (June 16, 2011); see also Yarborough, 541 U.S. at 662–63 (2004) (same). Thus, the actual, subjective beliefs of the defendant and the interviewing officer on whether the defendant was free to leave are irrelevant, and the reasonable person from whose perspective "custody" is defined is a reasonable innocent person. United States v. Brown, 441 F.3d 1330, 1347 (11th Cir. 2006) (quotations, citations, alteration, and emphasis omitted). Therefore, "[a] policeman's unarticulated plan has no bearing on the question whether a suspect was 'in custody' at a particular time; the only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation." Berkemer v. McCarty, 468 U.S. 420, 442 (1984).

The Supreme Court has addressed the issue of custody for purposes of requiring the Miranda warnings and provided a non-exhaustive list of factors courts should consider. "Custody" is a term of art under Miranda case law which specifies circumstances that are

thought generally to present a serious danger of coercion. In determining whether a person is in custody in this sense, the initial step is to ascertain whether, in light of "the objective circumstances of the interrogation," Stansbury, 511 U.S. at 322–23, a "reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave." Thompson v. Keohane, 516 U.S. 99, 112 (1995). In order to determine how a suspect would have "gauge[d]" his "freedom of movement," courts must examine "all of the circumstances surrounding the interrogation." Stansbury, 511 U.S. at 325 (internal punctuation omitted). Relevant factors include the location of the questioning, see Maryland v. Shatzer, 559 U.S. 98, 110–17 (2012), its duration, Berkemer, 468 U.S. at 437–38, statements made during the interview, Oregon v. Mathiason, 429 U.S. 492, 495 (1977); Yarborough, 541 U.S. at 665, the presence or absence of physical restraints during the questioning, New York v. Quarles, 467 U.S. 649, 655 (1984), and the release of the interviewee at the end of the questioning, Beheler, 463 U.S. at 1122–23. Determining whether an individual's freedom of movement was curtailed, however, is simply the first step in the analysis, not the last.

Not all restraints on freedom of movement amount to custody for purposes of Miranda. Courts have "decline[d] to accord talismanic power" to the freedom-of-movement inquiry, Berkemer, 468 U.S. at 437, and have instead asked the additional question whether the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in Miranda. The Supreme Court has noted its precedents "make clear . . . that the freedom-of-movement test identifies only a necessary and not a sufficient condition for Miranda custody." Shatzer, 559 U.S. at ___, 130 S. Ct. at 1224; Howes, ___ U.S. at ___, 132 S. Ct. at 1189–90; see also United States v. Luna–Encinas, 603 F.3d 876, 881 (11th Cir. 2010) (explaining that "although a reasonable person in the defendant's position may feel constrained

8

not to leave the scene of a police encounter at a particular moment—and thus may be deemed to have been 'seized' by law enforcement—he will not necessarily be considered in 'custody' for Fifth Amendment purposes. . . . Rather, 'a free-to-leave inquiry reveals *only* whether the person questioned was seized.' While 'seizure is a necessary prerequisite to Miranda, . . . a court must [also] ask whether . . . a reasonable person would have understood his freedom of action to have been curtailed *to a degree associated with formal arrest*.'") (citations omitted) (alterations and emphases in original).

The Eleventh Circuit directs courts to also consider several other factors in determining custody under the objective standard, "including whether the officers brandished weapons, touched the suspect, or used language or a tone that indicated that compliance with the officers could be compelled." United States v. Street, 472 F.3d 1298, 1309 (11th Cir. 2006) (internal citation and punctuation omitted). In making a determination based on the objective factors present in a case, "[n]o particular fact in the 'custody' analysis is outcome determinative—[the court] simply weigh[s] the totality of the circumstances." United States v. Lall, 607 F.3d 1277, 1284 (11th Cir. 2010) (quoting Brown, 441 F.3d at 1349)).

In this case, the weighing of the totality of the circumstances leads to the conclusion that Miller was not "in custody" for purposes of Miranda at the time Kirkconnell and Woodall spoke with him. Because only objective factors are considered in making this determination, it is immaterial whether Kirkconnell intended to arrest Miller.

As to the objective factors, Miller was questioned in his home. Although this circumstance is not dispositive of a finding that Miller was not in custody, the Eleventh Circuit has noted "'courts are *much* less *likely* to find the circumstances custodial when the interrogation occurs in familiar or at least neutral surroundings, such as the suspect's home.'" United States v.

Gomes, 279 F. App'x 861, 868 (11th Cir. 2008) (quoting Brown, 441 F.3d at 1348) (emphases in original)); see also United States v. Newton, 369 F.3d 659, 675 (2d Cir. 2004) ("[A]bsent an arrest, interrogation in the familiar surroundings of one's own home is generally not deemed custodial[.]"). Moreover, the questioning occurred at Miller's dining room table, and Miller was free to move about his home to make himself something to drink, to use the restroom, to secure his dog, and to make arrangements for the care of his dog. (Doc. 35, pp. 8, 11–13, 25–26.)

In addition, the evidence before the Court indicates Kirkconnell's interview of Miller lasted less than ten minutes' time. While the Court recognizes agents were at Miller's house for approximately one and a half hours, there is no evidence agents were questioning Miller that entire time. Rather, the evidence reveals the reasons agents were at Miller's house for that duration of time was because the agents had to wait for another officer with handcuffs to arrive at the house, to give Miller time to arrange care for his dog, and to finish the search of Miller's computer and home. (Id. at pp. 25, 32–33.) Assuming, *arguendo*, the interview had lasted for the entire hour and a half officers were present at Miller's house, courts have found this period of time—or longer—to not constitute custody under Miranda. United States v. McDowell, 250 F.3d 1354, 1362 (11th Cir. 2001) (approximately four hours); United States v. Muegge, 225 F.3d 1267, 1269–71 (11th Cir. 2000) (defendant interviewed for about two and a half hours); see also Yarborough, 541 U.S. at 656–65 (finding as reasonable the state court's determination that the suspect was not in custody when his parents brought him to station at detective's request, he was interviewed in small room for two hours by one detective, interview was recorded, and detective pressed suspect to reveal details of crime by appealing to his "sense of honesty"); United States v. Bassignani, 575 F.3d 879, 884 (9th Cir. 2009) (interview of two and a half hours was not custodial); United States v. Manta–Carillo, Criminal No. 11–00103–CB, 2011 WL 3235757, at

*2, *4 (S.D. Ala. July 28, 2011) (finding no custody where, among other things, the interview lasted about an hour and a half); Trantham v. Province, No. CIV 07–156–JHPKEW, 2010 WL 3734720, at *3 (E.D. Okla. Aug. 2, 2010) (holding defendant not "in custody" at any time when he met officer at a motel, not a police station, for approximately two hours and that the state court's determination was not contrary to, or an unreasonable application of, clearly established federal law); United States v. Jefferson, 562 F. Supp.2d 707, 717–18 (E.D. Va. 2008) (holding defendant not "in custody" for Miranda purposes when two FBI agents interviewed him for approximately two hours in his home concerning bribery investigation). The duration of the questioning in this case, even if it was approximately 90 minutes, points to it being non-custodial.

Further, while Kirkconnell did not tell Miller he was not free to leave or to end the interview if he desired, Kirkconnell stated Miller should have known this was the case considering his age and station in life. (Doc. 35, pp. 31–32.) Crediting Miller's assertion that he did not reasonably believe he was free to leave lends no support to a finding of custody. As noted above, the reasonableness standard is looked at from a reasonable, innocent person's view. While the Court makes no comment about Miller's guilt or innocence, the evidence before the Court at this time is that Miller admitted to possessing child pornography. The Court also notes Miller's statement in his affidavit filed the day before the suppression hearing that he was not told he was not under arrest. (Doc. 29, ¶ 2.) The Court credits Kirkconnell's testimony at this hearing that he did tell Miller he was not under arrest. The omission of this fact from Kirkconnell's report following Miller's arrest is not dispositive of this issue. As the Government

observed, Kirkconnell's report was not written in anticipation of a motion to suppress, yet Miller's affidavit was.[5]

Moreover, Miller was not handcuffed, searched, or patted down, nor did agents have their guns drawn. Indeed, Kirkconnell testified that none of the agents present during the search had handcuffs with them, and they had to wait until a local officer came to Miller's house with handcuffs to effectuate his arrest. While Kirkconnell also testified that he was wearing his gun by his badge and that Woodall carried a gun on his ankle (which was not visible), he also testified that the other officers present were not carrying weapons. (Doc. 35, pp. 13, 17.) In addition, there is no evidence before the Court that a gun was brandished at Miller or that he could even see the agents' guns.

Fifth, agents did not arrive at Miller's door with a show of force or police presence. To the contrary, Kirkconnell testified that he, as the lead agent in these child pornography cases, does not use helicopters or SWAT as some agencies do, as he does not believe in a great show of police presence. (Id. at p. 19.) Instead, Kirkconnell stated he wanted to get inside of Miller's house with as little attention as possible to avoid an unpleasant situation for Miller in the event his neighbors would have seen police officers at his door. (Id. at p. 20.)

As to the questioning itself, the record reflects Kirkconnell told Miller he would like to speak with him. Miller offered no response when Kirkconnell told him the agents wanted to speak to him. When Kirkconnell informed Miller he and the other agents were with the Southeast Georgia Child Exploitation Task Force and asked if Miller now knew why they were there, Miller volunteered information relevant to the investigation and assisted with the search by

---

[5] Agent Kirkconnell offered at the hearing that, had he written this statement in his report, it could be that there would have been no need for a hearing on Miller's Motion. (Doc. 35, p. 22.) The Court does not agree with this assessment in light of the assertions set forth in Miller's Motion and post-hearing Brief. However, whether Miller was or was not told he was not under arrest is not dispositive of the issues before the Court.

directing officers to his computer and by providing them with his password. There was no coercive language or actions from agents, as the record bears.

Based on the foregoing, the Court concludes that the totality of the circumstances demonstrates that Miller failed to establish that he was in custody for <u>Miranda</u> purposes during the interview. Thus, Miller was not entitled to <u>Miranda</u> warnings prior to any questioning.

The Court notes Miller's citation to <u>Stansbury</u> and <u>Howes</u> as support for his contention that he was "in custody" for purposes of <u>Miranda</u>. However, these cases do not lend the support Miller hopes.

In <u>Stansbury</u>, the Supreme Court reiterated that "the initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." 511 U.S. at 323. "[A]n officer's views concerning the nature of an interrogation, or beliefs concerning the potential culpability of the individual being questioned, may be one among many factors that bear upon the assessment whether that individual was in custody, but only if the officer's views or beliefs were somehow manifested to the individual under interrogation and would have affected how a reasonable person in that position would perceive his or her freedom to leave." <u>Id.</u> at 325. "Of course, instances may arise in which the officer's undisclosed views are relevant in testing the credibility of his or her account of what happened during an interrogation; but it is the objective surroundings, and not any undisclosed views, that control the Miranda custody inquiry." <u>Id.</u> (punctuation omitted). Even a clear statement from an officer that the person under interrogation is a prime suspect is not, in itself, dispositive of the custody issue, for some suspects are free to come and go until the police decide to make an arrest. <u>Id.</u> The Supreme Court concluded that the California Supreme Court's conclusion that Stansbury's <u>Miranda</u> rights "were triggered by

virtue of the fact that he had become the focus of the officers' suspicions, . . . is incorrect[.]" Id. at p. 326.

The Supreme Court reversed the Sixth Circuit Court of Appeals' decision in Howes that Supreme Court "precedents clearly establish that a prisoner is in custody within the meaning of Miranda[ . . .], if the prisoner is taken aside and questioned about events that occurred outside the prison walls." ___ U.S. at ___, 132 S. Ct. at 1185. In so doing, the Supreme Court reaffirmed its prior decisions and stated "the initial step" in determining whether someone is in custody "is to ascertain whether, in light of the objective circumstances of the interrogation," "a reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave." Id. at ___, 132 S. Ct. at 1189. "[I]n order to determine how a suspect would have 'gauge[d]' his 'freedom of movement,' courts must examine "all of the circumstances surrounding the interrogation." Id. (quoting Stansbury, 511 U.S. at 322, 325). "Relevant factors include the location of the questioning, its duration, statements made during the interview, the presence or absence of physical restraints during the questioning, and the release of the interviewee at the end of the questioning[.]" Id. (internal citations omitted).

The Stansbury and Howe decisions make it clear that courts are to look at the totality of the circumstances to determine whether a suspect is "in custody" and merely reaffirm the Supreme Court's post-Miranda decisions. However, it is apparent Miller wishes for the Court to look at one or two circumstances involved in the questioning. The Court must look to the totality of the circumstances, and that review clearly reveals that Miller was not "in custody" during Kirkconnell's questioning. Accordingly, Miller was not entitled to Miranda warnings prior to the interview, and his statements are not subject to suppression.

CONCLUSION

Based on the reasons set forth above, it is my **RECOMMENDATION** that Miller's Motion to Suppress Statements, (doc. 20), be **DENIED** and that the Government is entitled to use Miller's statements given on June 23, 2015, as evidence in the trial of this case. Any party seeking to object to these rulings must file specific objections within **fourteen (14) days** of the date of this Report and Recommendation.

Any objections asserting that the Magistrate Judge failed to address any contention raised in the Motions must also be included. Failure to do so will bar any later challenge or review of the factual findings or legal conclusions of the Magistrate Judge. See 28 U.S.C. § 636(b)(1)(C); Thomas v. Arn, 474 U.S. 140 (1985). A copy of the objections must be served upon all other parties to the action.

The filing of objections is not a proper vehicle through which to make new allegations or present additional evidence. Furthermore, it is not necessary for a party to repeat legal arguments in objections.

Upon receipt of Objections meeting the specificity requirement set out above, a United States District Judge will make a *de novo* determination of those portions of the report, proposed findings, or recommendation to which objection is made and may accept, reject, or modify in whole or in part, the findings or recommendations made by the Magistrate Judge. Objections not meeting the specificity requirement set out above will not be considered by a District Judge. A party may not appeal a Magistrate Judge's ruling directly to the United States Court of Appeals for the Eleventh Circuit. Appeals may be made only from a final judgment entered by or at the

direction of a District Judge. The Clerk of Court is **DIRECTED** to serve a copy of this Report and Recommendation upon Miller and the Government.

**SO ORDERED** and **REPORTED** and **RECOMMENDED**, this 30th day of October, 2015.

R. STAN BAKER
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF GEORGIA